We'll hear argument first this morning in Case 11-166, Radlax Gateway Hotel v. Amalgamated Bank. Mr. Neff. Mr. Chief Justice, and may it please the Court, the question presented in this case is whether a secured creditor must be allowed to credit bid when its collateral is being sold under a Chapter 11 plan. The relevant section of the Bankruptcy Code plainly says no. Section 1129b2a provides that a Chapter 11 plan must be fair and equitable to the secured creditor that objects to it. It then provides three alternatives that the debtor can pursue to satisfy that test. Any one of these three alternatives can be used when assets are being sold, but only one of them requires the right to credit bid. Under subsection 1, the plan must allow the creditor to retain its lien and receive payments over time with the present value equal to the value of its collateral. Under subsection 2, the plan must allow the creditor to credit bid when its asset is being sold free of its lien. But under subsection 3, the plan must provide the creditor with the indubitable equivalent of its secured claim. The debtors have chosen to pursue a plan, a planned sale without credit bidding under subsection 3. The plain language of the statute permits that result. Ginsburg Well, how does one determine what is the indubitable equivalent of the creditor's claim? The indubitable equivalent will be determined at the time of planned confirmation, in our case after the sale has been conducted, although not yet approved by the Court. So the Court will have to prove it. The sale can't go on without the Court's approval. I mean, the auction has to have the Court's approval, right? Well, here's what happens typically. The debtor files a motion, as we did in this case, to approve bid procedures. The Court then determines whether those bid procedures are appropriate for the sale. The sale is then conducted. Then the debtor goes to planned confirmation, and at the planned confirmation hearing, aside from establishing the 16 requirements of section 1129 for a plan to be confirmed, the debtor also seeks to confirm the results of the sale. And so what qualifies as indubitably equivalent? The indubitably equivalent must be an amount that is at least equal to the amount of the secured claim. In essence, it's going to be determined by what the asset sold for, provided that the sale has generated the best possible price for the asset. Suppose the creditor thinks that the sale was undervalued, the assets, that it wasn't the equivalent? The creditor has an opportunity at the planned confirmation hearing to raise any issue with regard to the sale process, with regard to the auction that occurred, has the received at the sale that occurs. For instance, could say, well, they conducted this auction, but I have an appraisal here that says the property is worth much more, so this can't possibly be my. Alitoso, isn't the issue who is going to decide whether something is really the indubitable equivalent? Is it going to be the judge, which is what you would like, or is it going to be determined through a particular bidding procedure, namely, where there can be credit bidding, which is what the Respondent would like? It's going to be the judge after reviewing what happens at the sale. The problem with allowing a creditor the right to credit bid under all circumstances is in a case like ours, we don't believe we'll ever get to an auction because no one else will show up. Well, if the Respondent thought that what the judge would determine would indubitably provide the indubitable equivalent, then there wouldn't be an issue here, right? The reason why there's an issue is because they don't think that what the judge will decide will indubitably provide the indubitable equivalent. In this particular instance, I would suggest that the creditor simply does not want the asset sold, would rather take the asset back and hold it for some time period. So it's not a question of whether the creditor would hold it for some time period. Roberts, isn't that pretty much what he bargained for when he insisted upon security before giving the loan? Well, what they bargained for was that the asset be liquidated and all of the proceeds applied to their loan. And that's exactly what we proposed to do under our sale procedure. Well, you're depriving the secured creditor of the opportunity to hold on to the asset because he thinks it is, for perhaps a short period, unreasonably devalued. Well, he's denied that right under subsection 1, which is our traditional reorganization, internal reorganization provision of section 1129, B2A. Could I cut short your answer to Justice Alito? Well, with regard to the indubitable equivalence, clearly the judge is going to make the determination, but that's no different than the judge making the determination under subsection 1 as to what the fair market value of the collateral is for purposes of determining the note that the creditor is going to receive and be paid off over time. Could the judge say when the proposal is made to him, the only way I can be sure that it's the indubitable equivalent is to have the sale open to credit bidding, which is what we always do? Can the judge say that? If there is testimony provided to the judge that that is the way that will maximize the sale proceeds and that, in fact, you can't get indubitable equivalence unless you allow credit bidding, it would seem to me under that circumstance the judge would have that discretion. Now, you're saying to me what you're saying, because under all circumstances, the credit bid, unless the property is valued higher than the credit bid amount, but then another bidder could enter that bid. Maximum value always has to be the value of the credit. If the creditor is willing to put it at risk that way. Your Honor, I would disagree. I think in a situation like ours, no one else is going to come to bid. Because creditors who are potential purchasers who are looking to buy a hotel have multiple opportunities to buy other hotels. So if they know that they are going to show up at a sale where a creditor is owed substantially in excess of what the property is likely to sell for, they are not going to spend their time and effort doing the due diligence that's required to acquire or make a bid on an asset like a hotel. Breyer, so what's wrong with that? I mean, the creditor loaned you a million dollars, well, the million dollars. He got an interest, a secured interest, in a piece of property. And that property is worth whatever it was, whatever it's worth, less than a million. And he says that's the deal, I have a secured interest in this, I want the property. Now, you're better off because you can stretch out the payments over time and maybe you don't have to give it to him immediately, but I don't see anything unfair about saying, give him the property if he wants it. That, in essence, would be denying Chapter 11 relief to a host of debtors where their collateral is worth something. Well, in accordance with 1, 2, and 3. I mean, I'm not saying skip those. But the problem is you're cutting off the bankruptcy process really before it has happened. I don't understand that. I mean, as I read it, to put it out on the table, I read this makes perfect sense. What they're trying to do is help the debtor a little without mucking up the secured creditor's collateral. Choice one, give the secured creditor his collateral. And there's still a lien on it. He has what he had before, and the debtor is better off because he can stretch the payments out over time, and that's 1 and 2. Choice two, we give the creditor some new collateral. That's a little risky, but to be sure it's fair, we're absolutely certain with respect to a few exceptions, not relevant, but the creditor can credit bid, so he has it within his control. Choice three, something else which comes up in different situations, for example, a creditor who is oversecured, see, and they want to sell the piece of property. And he says, sure, I'll let you sell it, but I want something that's the equivalent. Give me this other property over here that you own that has no liens at all. And the judge can look at that and say that's fair. That's what 3 is basically about, as far as I could understand it. So it all makes sense to me, and I don't understand why you would want to have a rule saying that 3 trumps 1 and 2 and stops credit bidding. So that's the whole thing, as I'm seeing it at this moment, so I'll give you a chance to reply. Thank you. Your Honor, I don't see subsection 3 as having the limiting language that it should have if, in fact, it was meant to be something other than what is in subsection 1 or subsection 2. There's no language that says, except as provided for in subsection 1 or 2, relief other than. Breyer, it doesn't have the language, which is why we have a case, but I mean trying to interpret it in a way that makes sense. What's wrong with what I said is a way that makes sense. I mean, why, since we're trying to give the creditor the indubitable value at the very least, the best way to do that would be let the creditor credit bid. So why not? And you can read it. You don't have to read it the way that you want. You could read it the opposite way, too. If you're looking at it from the perspective of the creditor saying, well, this is No, I'm looking at it from the perspective of a bankruptcy system that is trying to get secured creditors what they have their security in while giving the debtor the advantage here of being able to stretch out his payments. I agree. And there are other parties and interests in a bankruptcy case, including obviously unsecured creditors, that get nothing if the result is all the creditor gets is the relief from the automatic stay to foreclose on the collateral when you have this great discrepancy between what is supposed to happen. Kagan, Well, how would they get anything anyway? I mean, your brief suggests that somehow there are these unsecured creditors in the mix who are going to receive some benefit if your understanding of this statute goes forward. But, you know, in a circumstance like this, doesn't the secured creditor either get the property or get the money from the property and the unsecured creditors are out of the mix regardless? Well, in our particular instance, obviously there are some senior liens that would be paid, including things like mechanics liens and real estate taxes. There are other costs that But those are, those continue forward, so even if the secured creditor got the property, there would be mechanics liens on the property, isn't that right? That's true, although resolving them pursuant to a plan is usually a better resolution for them by providing more certainty and with regard to the result and a more quicker resolution usually, as opposed to being relegated only to State court to fight them. And our particular Mr. Neff, are you done? I'm sorry. I didn't want to stop your answer. I was only going to say that in our particular instance, the stocking horse had agreed over a future time after it obtains the property to provide for recovery to general unsecured creditors. Can I add, let's look at the text. Little 2 provides for exactly what you want to do here. What you want to do under 3 is precisely what 2 says, except you want to eliminate subject to section 363K of this title, right? Does it make much sense for a provision to say you can do it three ways? Number 1, number 2, you can have this sale subject to credit bidding. And number 3, after saying that specifically, oh, you can have this sale not subject to credit bidding. That's not a very sensible statute. Why go through that problem of saying number 2 if you could have left it to number 3 anyway? Subsection 2 provides that if you allow credit bidding, regardless of the price that's achieved, that that is deemed to be fair and equitable treatment of the secured creditor's claim. Sotomayor, but that's just not true from what you just said, meaning what you just said is that the buyer obviously is paying other things off, and by definition he's deducting that from the purchase price. No one gives a purchase price for a piece of property and agrees to pay something else and gives the highest price for the property once they've done that. So what you're asking for is permission for the debtor to use this property to pay other debts. And that's what I thought a secured interest prevented. With regard to Justice Scalia's question, all I was trying to point out is that in terms of the price that is achieved, as long as you allow the secured creditor the right to credit bid, that's deemed to be fair and equitable. Sotomayor, why doesn't he get everything that this buyer is promising to everyone else? But that, indubitably, is part of the price, because he's giving out money to others. That's part of the value of this property. So why isn't the creditor, the secured creditor, entitled to all of the proceeds from the property? The secured creditor will get all of the proceeds from the property. No, it's from the sales price, but not from all the payments. With regard to the payments that are in the future, those are after the sale will be consummated to the stalking horse bidder. You still haven't answered my question. There are other benefits that the secured creditor will get that will increase the price that is received by having sold the property in bankruptcy. For instance, when you sell through a plan, you avoid the payment of transfer taxes. So clearly, to the extent that the transfer taxes being saved are in an amount that exceeds what ultimately goes to the unsecured creditor, is the creditor being overpaid. Sotomayor, if the buyer had money that he's willing to give up to others, why isn't he putting it in the purchase price? Why isn't that part of it? It would be our obligation to show at confirmation that the creditor is paying the top dollar for the asset. If the creditor desires to pay a bonus or a premium on top of that, we would have to show that nonetheless that the secured creditor is receiving the indubitable equivalence and either have to show by argument that of the savings on the transfer tax or some other way that this is not causing the secured creditor to not receive the indubitable equivalence. Sotomayor, could you explain what the reasoning is for requiring a credit bid if property is sold during the plan, but not permitting it when it's sold at plan time? Sure. Doesn't that delay the bankruptcy in every situation? I can't actually understand what benefit other than delay of the bankruptcy process that would occasion. Is your question why we always have it under Section 363, but not under the plan? Mm-hmm. Section 363 allows a sale of property outside the ordinate course of business during a bankruptcy case. It can be done as quickly as on 21 days' notice. So it can be done on a very truncated basis, or even more quickly if the debtor can show that there is cause, some reason to have an even faster sale. There is no requirement that you show that any of the plan requirements in Section 1129 must be met. So there are good reasons to have this protection for the secured creditor. When you are selling under Section 363 outside of a plan context, that don't necessarily exist when you are selling in the course of a plan, because a plan takes a much longer time period, usually at least 2 months' notice, if not much longer. Mr. Neff, don't you feel sorry for the United States? The United States is often in the creditor situation, and the United States cannot come up with cash. Is it going to run to Congress and get an appropriation for each security case it has? What do you propose we do with the United States? The United States just can't take any security interest anymore, or what? Neff Well, no, I don't think that that's the case. And I did see that in their brief, and I don't know the extent that in practice that actually occurs, because, for instance, they pointed out the SBA loans, those are typically guaranteed loans. So there would be a motivation, at least by the principles of the debtor, to maximize the return to the SBA. But as far as them not being allowed to credit bid, there are — they have the opportunity to have a greater voice in the sale process. They can seek — Scalia I don't understand what you mean. Neff Well, they can seek from the bankruptcy court a greater role when the asset is being marketed for sale to ensure that they are receiving top dollar on their claim. Sotomayor I don't have that right now. I don't have that right now. Neff Well, when we sell assets, the debtor typically has the control over how it's going to be marketed and sold. They may give some input rights to the secured creditor, but they're usually not going to give the secured creditor the veto power over how to conduct the sale. But I would suggest that when you have a situation with a creditor that truly cannot bid cash, that there would be an opportunity to impress upon the judge that they need to have a greater role when you're actually marketing and selling the property. Kagan Mr. Neff, can I understand how your system would actually work in practice? Suppose you have an auction and the top value is $500, and then you have the secured creditor, let's say, is in the position of the United States and comes in and says, we couldn't credit bid, but we — excuse me — we couldn't pay cash, but we think it's $750. Neff Right. Kagan And now the court has to decide whether it's $500 or $750 after the auction has gone forward. What happens? Neff The court is going to review the process to actually sell the asset, you know, who was — where was it marketed, who knew about it, who showed up at the auction, how many bids were made. Kagan Well, now let's say the court says, you know, I think that the government is right, it's really $750, but you've already had a sale and you've sold it for $500. Neff There's been no closing. The closing doesn't occur until the plan confirmation actually occurs. And, in fact, that's how you would do it after this Court's ruling in 2000. Scalia Wouldn't the court always say when it's confronted with this situation, the government comes in and the court said, yeah, well, you know, I guess that that price is probably so low because nobody could credit bid? Wouldn't that always be a frailty of whatever — whatever price it sold for? Wouldn't it always be? Neff No, because you're going to have situations where creditors, secured creditors will credit bid amounts that have no relationship to the fair market value. We call, for instance, loan-to-own lenders, where their only interest is actually getting the title to the property. So you're going to have situations that — where the credit bid does not equate to money. Scalia Well, that might be, but, you know, it doesn't take a genius to figure out that if you allow people to bid for cash or for credit, you're going to get more credit bids than if you allow them to bid for cash only. Neff The problem is when you're dealing with larger assets like what we're dealing with, you're not going to get a sophisticated buyer to come in to bid against a lender that can credit bid, particularly in a situation like our case where the lender has said, I simply want the property back. Scalia That just means that you can't find a buyer who's willing to pay that much. Neff Well, we believe that subsection 3 allows us to show that the secured creditors receiving the employer's credit are the ones who are receiving the employer's  Breyer Look, in subsection 3, if it applies here, I assume there's a — suppose it doesn't apply here. There's a safeguard against having no bidder. Bidders who would bid more than what the creditor thinks it's worth, the creditor will want them in this. And if he doesn't want them in it, he thinks it's worth more in his own hands. So what's the problem? But there is a problem the other way. The problem the other way, and I'm not saying it's this case, but there are — that the insiders say to the stalking horse, we'd like you to put this up at a low price and give us a job. And if they keep the creditor out, well, that's a big incentive and they're the ones who know what a hotel is worth, the judge doesn't know, and there's always leeway. And so that was worrying me about this fact pattern. Do you want to get rid of my worry? Yes, I do. The bankruptcy judge sees this in a variety of cases. Just the natural tension that you have in a bankruptcy, individuals who may be self-interested, yet they are supposed to be fiduciaries for the estate. It's part of our roles as lawyers to be the fiduciaries as well. Our particular instance, it's not a concern because the property is being marketed to a wide array of people. There's no requirement that they keep the management company, and there's every opportunity for any other hotel company to come in or any other strategic buyer. Breyer, but the concern was, I gather, there is no other bidder, you've said. You've just found the stalking horse. You agree to pay the stalking horse $1.5 million in case he doesn't get it. And then the people from the inside are being hired by the stalking horse, if he wins. Now, I'm not — I'm sure they're acting very honestly, but you'd have to say in such a situation that there is an incentive to try to value everything on the low side by the debtor to make sure that stalking horse gets the property. And that incentive is destroyed, or at least doesn't work, if you allow the creditor bid. Interestingly, the process actually works a little different than that. You — debtors will go out and the financial advisors will actually go out and try to market the ability to be the stalking horse, to actually try to get the best stalking horse bid. In this particular instance, what we got was the — ultimately, the $55 million. We're confident the property ultimately will sell for more. Alito, when this procedure is followed, how often does a buyer, other than the stalking horse, obtain the property? I don't know from a statistical basis. And the stalking horse, if they have the — a breakup fee, they have that built-in cushion. And in our case, I would point out the judge had not yet approved the breakup fee, but it was a standard 3 percent of the — of the bid price. So I don't know what percentage it is. And from my own experience — Scalia, I didn't realize the judge had to approve the — I didn't, yeah. The judge has to approve the stalking horse. That's part of the bid procedures. In buyers, more sophisticated buyers than when you deal with figure assets, they're used to the process being this way, that there's going to be a stalking horse. And that there's going to be some sort of protection. Sotomayor of bankruptcy courts have permitted credit bidding in these situations. So if the vast majority of bankruptcies have stalking horses, then the norm is working without us having to rule in your favor. I would say the vast majority of cases occur under Section 363, where there's no question because of 363K. And stalking horses still come in. So it's not as if the 363K procedure is failing in maximizing prices. That is true. The major difference is that a sale under Section 363K almost invariably the secured creditor supports. So there's no question but that there's going to be a transaction occurring. Whereas — I'll say it again. I didn't understand it. When you're selling under Section 363, because of 363K, there must be a right to credit bid, and in most situations, the secured creditor wants the asset sold when you're doing a Section 363 sale. So there's no question in the minds of a buyer but that there's going to be a transaction and there's a reason to spend your time and effort learning more and doing due diligence about the asset. Roberts. Well, this is a case, though, where you would not want the asset sold. In other words, looking at it, he thinks for particular unusual situations, this is vastly undervalued. I'm holding an asset that he's going to appreciate if I hold on to it. So he doesn't want the asset sold. That's correct. And it's our belief that the Bankruptcy Code provides the ability in subsection 3 to conduct the sale and pay the secured creditor the indubitable equivalence of its claim. And what is the doubtless equivalent of his claim, measured by the current market conditions, or does that include some premium based on the assumption that it's going to increase in value over some period? It's going to be measured by the current market conditions, but to the extent that the secured creditor brings in an appraisal, that will invariably be based on what the projections are going to be and take that into account. So if I could reserve the remainder of my time. Thank you, counsel. Ms. Maynard. Mr. Chief Justice, and may it please the Court. Secured creditors bargain for the right to be repaid in full, or if not, to foreclose and take the collateral that secures their loan. When a Chapter 11 bankruptcy plan is going to cram down a plan over the objection of the secured creditor, Section 1129b2a gives the secured creditor the ability to protect those rights regardless of the proposed treatment of its collateral. Specifically, when the plan proposes, as here, to sell the collateral free and clear of the secured creditor's liens and give the secured creditor nothing but the proceeds from that sale, Clause 2 entitles the secured creditor to bid what it is owed in the absence of cause to preclude it. Or, or he's entitled to realize the indubitable equivalent of his claims. You really do just kind of elide the fact that the statute says, or. No, Your Honor. We give full meaning to the or. We don't dispute that these are three alternative ways to cram down a plan. The question here is or what? And the question is the scope of the alternatives and in which circumstances they apply. And here, Congress turned its attention to precisely the situation at hand and determined what the requirements were, but not just the requirements for a sale free and clear. It's not like Clause 2 says, if you sell it free and clear and you allow credit bidding, then that's one way to go. It's not just the requirement of credit bidding. It also sets forth the only exception to credit bidding. And Petitioner's reading would read Clause 3 to be a much bigger exception. Now, Petitioners here tried and failed in the bankruptcy court to prove cause, and they don't appeal that. So they're trying to create a much bigger exception to the exception Congress allowed. Scalia Are they tried and failed to prove what? Clause. Your Honor, cause. Cause. So under we reprint the 1129, Clause 2 is on 20A in the red brief at the back. And it provides for the sale, comma, subject to section 363K of this title, comma, of any property that is subject to the liens in securing such claims, free and clear of such liens. And that refers you to 363K, which is also at the back of our brief. And 360K provides that unless the court for cause orders otherwise, the holder of such claim may bid at such sale. And if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property. So my point is Clause 2 is not just if you let them credit bid, then that's one way to go to fair and equitable. It's you must let them credit bid unless cause is shown. And they tried in the bankruptcy court, Justice Scalia, to prove cause, and the district court found against them on that point, and they don't appeal it. So there's a difference. Roberts Your friend on the other side suggests that 2 and 3 address different ways of protecting the secured creditor. 2 is procedural, right? You can go through these procedures and then you can cram down, so long as you've gone through these procedures, which include credit building, or you can cram down if you ensure that he receives the indubitable equivalent, a substantive protection. What's wrong with that reading? I don't think that's a fair characterization of the three clauses, Mr. Chief Justice, because all three of the clauses have both procedural and substantive components. And essentially what Petitioners seek to do here is exchange their preferred procedure, which is a sale without allowing us to credit bid, followed by a judicial determination of whether whatever number that sale produces is high enough to be our secured claim. But the whole point is, if the secured creditor is willing to bid one more dollar of what it's owed at the sale, that is the value of our secured claim. Is it correct that really the heart of your argument is that the real value of this property is greater than the value that you think the bankruptcy court would assign to it if this were done under subsection 3? That is definitely the fear, Justice Alito. And why? Why do you have that fear? Because valuations are inherently uncertain, and Congress knew that. And in this Bankruptcy Code, Congress tried to move away from judicial valuations for precisely that reason. Kagan, but doesn't Clause 1 depend upon a judicial valuation? In Clause 1, the court has to say, what's the present value of your property, so that it knows what the right income stream is. That's true, Justice Kagan, but if you proceed through Clause 1, the Code provides the secured creditor with a different protection against undervaluation. So the whole Code structure is set up to protect the secured creditor against the risk of undervaluation of its claim, and that's the Section 1111B election. So the Section 1111B election allows a secured creditor who is undersecured and is afraid that their value of their property will be misvalued in a Clause 1 to elect to have the entire face value of their claim treated as secured. So here, the lenders are owed more than $130 million. If they were to proceed under Clause 1, the lenders would have the option to have that whole $130 million treated as secured, and that would be the value of the secured claim. And under Clause 1, yes, we would then be subject to the judicial determination of the present value of whatever a note paying out $130 million would be, but two protections we would have. They wouldn't be determining the principal. The principal, the face value of the note, would have to be $130 million, and the lien that we would retain would be $130 million. Kagan. Kagan. How about in subsection 3, where it talks about substitute collateral? That's completely a judicial valuation, isn't it? That would be true, but I think in that situation, we would also have the option to make the 1111B election, and therefore, they would have to substitute collateral that would be up to the $130 million mark. So it's true, and it's true that Congress did leave this other, but it is an other. And I think another way to — another point to make that clear is the fact that Clause 2 expressly has a role for Clause 3, and it doesn't come into play until after the secured creditor gets the credit bid. And if the stock is too high, the secured creditor gets the credit bid. Alito, what is it about the auction process that you think is likely to produce or creates an unacceptable risk of producing a valuation that is too low? Is it because of the use of the stalking horse, or what is it about the process? If the secured creditors aren't able to come in and bid their credit, and if the secured creditors don't have cash to bid the amount of their credit in cash, and in some instances, as with the government, therefore, they can't, they actually can't, but in a lot of these complicated loans, there's multiple lenders, and it would be very difficult to come up with the money to put in, and they are therefore you're taking out of the marketplace one of the most knowledgeable bidders about this property, and there's no good reason to do that. These, it's not like they're bidding funny money. They've already put in $142 million. Roberts, but there is, of course, a good reason, which is consistent with the policy of the Bankruptcy Code, which is you do want to look out for the other creditors as well. And if the secured creditor is getting indubitably the value of this security, why don't you weigh in the balance, at least the interests of the other creditors? There will be no cash for anyone junior to these creditors unless these creditors are paid in full, regardless of whether everyone bids in cash or we bid in credit. This property is well underwater. There's no equity in it. The secured lenders have lent them $142 million. Maybe in this particular case, but that's not going to be true in every case, and we're asked to issue a ruling that's going to apply in every case. In every case where the property is underwater, there will be, in every case in which the secured creditor has a lien on the property, the secured creditor takes first. So until the, so underwater or not, until the secured creditor is paid. Well, I know, but the whole premise of why this problem arises is that the security is worth a lot less than it was, obviously, when it was purchased, or a lot less than the, a lot less than the claim that it was meant to secure. Everyone agrees that the property is underwater, but it's important to note that the valuations in this case that have been filed in the district court in conjunction with the re-from-the-stay, the appraisals are different by tens of millions of dollars what the property is worth. And if you allow that to go to a judge to decide whether it's enough, that's an inherently uncertain process. And, you know, judicial valuation, the court, tens of millions of dollars, the judge could decide, and it might not be a fact that we could overturn if that goes to a purely erroneous claim. Breyer. I was just guessing before, but I mean, if you're right, what is the three, the indubitable equivalent, what kind of situation does that come up? I mean, I was guessing it would come up maybe an over-secured creditor, they want to sell the property and he still wants his security and they have to put in an equivalent property that wasn't mortgaged, but I was just guessing. So what is it really used for, in your opinion? The legislative history, Justice Breyer, suggests two meanings for it, two examples. And that's what you see in the case. There aren't very many clause 3 cases. There will be many more if this Court holds that this is permissible. But there aren't very many clause 3 cases. And they abandonment of the collateral. So in other words, they could decide just to turn all of the collateral over and that would be the indubitable, that would be res ipsa, our secured claim. I mean, that, we have collateral on everything they own, the hotel, the garage, all of the proceeds. Or, as Justice Kagan was suggesting, some of the cases involve providing a substitute lien. But the courts are very hesitant to do that and it would have to be really, because it is, you know, you are stripping our lien, you're supposedly giving us an equal lien. So, you know, maybe if you can imagine, maybe if these creditors owned the airport at the Dulles, you know, the hotel at the Dulles airport and a parking garage, and one could say it's exactly the same risk factors and everything and we're going to swap that in for this. Sotomayor, could you tell me what's the purpose? If you permit credit bidding, why do you go through the sale at all? If it's always, if the credit is always going to be higher than the value, why don't you just turn over the property? Under 3, what, why do you, why do you go through the sham of the sale? It's not a sham, Justice Sotomayor, because the creditor, secure creditors don't often want to run a hotel and parking garage. They may not want the property. So what they are interested in doing is maximizing the value, getting back as much as they can of the money that they owe. So it is the stalking horse stance. At what point do they credit bid until they get the highest price from someone else and then let that other person have it? Is that it? That's definitely one of the strategies. And if they, so they, so what clause 2 allows the secured creditor, it allows the secured creditor to choose whether it takes its property, which was the right it had pre-bankruptcy, or whether it's enough. But if you leave it to their system, and he said, I'm sorry, I'm sorry, I'm sorry. Sotomayor, when do you think under 363K, what's good, what would constitute or has constituted in the case law good cause not to permit credit bidding? What situations have arisen under 363K where a court has found good cause? The cause cases include malfeasance of the creditor in some way. I'm sorry. Malfeasance of the creditor in some way. Or whether there might be a. How does a creditor commit malfeasance? I'm sorry. I can't remember any specific examples. But another instance, and it's actually one that goes to something Justice Kagan asked earlier, which is, is when there's some dispute about priority or whether there might be senior liens. So in this case, the bankruptcy judge provided at 44A and 45A, because there are some real estate taxes that would be senior to our liens, and there's a debate about whether the mechanics liens are senior or not. And so the bankruptcy judge provided that here it would be appropriate for us to either put up cash in that amount, the amount of the potentially senior liens, or to offer, you know, some security to cover those in the event that they turn out. And that is an example of cause. And that is clearly answers the concern that there may be others. No one junior to these creditors is going to take anything. And all Making Us Cash Bid would do, assuming the secured creditors are able to come up with the cash to bid in this amount, would be to enlist, just to pointlessly cycle money into the estate, and then if we're the winning bid, through the estate and back to us, at the risk of their siphoning off some money that really shouldn't go to anyone else. Because we have the cash collateral is these secured creditors, the hotel and the parking garage are all these secured creditors collateral. Now, the Petitioners say this is going to, if you let the secured creditors bid, this is going to chill credit bidding. Well, they tried to prove that in the bankruptcy court, and the bankruptcy court at pages 43a and 44a rejected that as a matter of fact. But anyway, as a matter of theory, their proposal, who would bid in their proposal? Their proposal is you do the due diligence, you have to prove you have the money, you put up the bid, and then at the back end, you know that the secured creditor is going to be able to come in and tell the bankruptcy judge, I would have bid more with my secured credit. So anyone who bids knows that there's the potential that it's all going to be a waste of time. And then how do you do it over at that point? Once everybody has shown their hand, put their bids in, we're going to take a mulligan after the bankruptcy court says, no, they're not getting their renewal of equivalent because I find they would have bid more in their security? But that's just that? Who's going to bid in that case? Roberts, how does this work in practice? Is this something that is subject to extensive negotiation? The secured creditor says, well, I'm interested in bidding and a credit bid, but I appreciate that that's going to make it difficult for you to get cash and you've got these unsecured creditors who would want, and so what? I'm not going to credit bid so long as or I will only credit bid up to this particular amount or let's sit down and work out a deal, negotiate over exactly how we're going to handle my security? Is that really how it happens or is that not or not? I think all those things are ways that it can happen, Mr. Chief Justice. And certainly, counsel was distinguishing the, during the plan sale requirement where he concedes that if you do a 363B sale, you know, 363K applies, but he says it's not a problem because you can negotiate. There are actually many negotiations in a plan sale context, and it would be odd, I would suggest, that you can do a cram-down plan over the secured creditor's objection and have less credit-bidding rights than you can when you agree to do it. And so in the end, there's nothing wrong with the secured creditor coming in and bidding its credit and taking the asset. After all, they already put in $142 million. They're owed $130 million. The debtors have no equity in this process. Wouldn't that be a reason for saying there's no adequate, there's nothing under 3 that would be the indubitable equivalent? In other words, one thing is to say that if you, if 2, if you fit into 2, that's it, you don't go to 3. Another is to say, well, you can go to 3, but it's most unlikely that there would be the indubitable equivalent of allowing credit-bidding. I don't think that latter way would be the better reading of the statute, Justice Kagan, who paid close attention to this precise problem and decided that the best way to protect the secured creditor against the risk of undervaluation was to allow it to bid. And I think for the reasons I said earlier, the system that they propose is not a workable system or a good system, and it wouldn't be good to have there be uncertainty about the auction, about whether or not it was going to ultimately, you know, go through. And as long as the secured creditor is willing to bid at the auction, it's secured credit, put its money where its mouth is, that is the value of its secured claim. And so it could never be the indubitable equivalent to go under 3 where it's not allowed to bid. Kagan, The Petitioner suggests that the usual rule that the specific governs rather than the general provision doesn't apply in this case because the specific is not a subset of the general. What's your view about that? Well, this Court's never applied the rule in that way, and I think the Court – it's always the case that when the Court's looking at these kinds of problems, that the general provision could be read to encompass what the party before the Court is seeking to do. But the – when Congress has set up a precise scheme, and here I think it's important to realize it's not just the requirements, but also the exception to the requirements, and then also the way that 2 is – refers to 3, and 3 doesn't pick in at half of  Scalia, I lost you. I lost you. Okay. It's not just the requirements, but the exceptions to the requirements. What are you referring to? The forecalls. So by reading in 363K, Justice Scalia, it's not only the requirement of individual bidding, but also the only exception. But then also, if I could just elaborate this, the point about how it refers to Clause 3, on 20A of our brief, we set forth the text. The final clause of Clause 2 says that once the sale goes through, the liens attach to the proceeds of the sale, and the treatment of those liens on the proceeds are done under Clause 1 or Clause 3 of this subparagraph. So Clause 2 contemplates that there will be some judicial determination of indubitable equivalents, but only after the amount of the proceeds. Because after all, what we're trying to determine here is the value of the secured claim. Roberts You said earlier we've never said that the specific has to be a subset of the general. How would it otherwise be specific in the one general? It seems if they're not a subset, then they're alternatives. I don't see how the whole doctrine makes any sense if the specific is not a subset of the general. Well, maybe I misunderstood Justice Kagan's question or I misunderstood their point. I felt their point was looking specifically at the facts of the Speedy Trial Act case and saying because it's a list and it says includes and then there's subsets under the list. That's how I understood their argument. Yes, it's certainly true. Like, take the venue statute case. You know, the general venue provision clearly covered patent infringement suits, but then there was a specific patent infringement venue statute, and this patent infringement statute didn't say it was the exclusive patent venue statute, and the general venue statute didn't say, except as otherwise provided in the Code, yet this Court said, well, the patent that Congress turned its attention to patent infringement suits and created this venue, and that's the venue statute. So when we say, our doctrine says the specific controls over the general, the specific is a subset of the general. Yes, to the extent that I think it's always fair to say that what the party who's claiming they fit within the general does could definitionally possibly fit within the general. Thank you. Thank you. Ms. Harrington. Thank you, Mr. Chief Justice, and may I? It's a case for the government, Ms. Harrington, isn't it? Pardon me? It's a big case for the government. It is a big case for the government. As you suggest, the government is in a position of — that actually many secured creditors are in these days, which is that we have constraints on our ability to cash a collateral through a bankruptcy. And the detailed crammed-down provisions of Chapter 11 are designed to protect the rights of secured creditors. The essence of being a secured creditor, of course, as the Court has suggested, is that the secured creditor has bargained for the right either to get its money back or to get the thing that secures its loan to get its collateral. And the type of sale that's contemplated in Clause 2 of Section 1129b2a is precisely designed to guarantee that the creditor will get the benefit of its bargain. You've got a whole cadre of U.S. trustees that presumably can look out for the interests of the poor United States. Well, in most Chapter 11 cases, the U.S. trustee doesn't play a role because it's a debtor in possession. And so the trustee isn't in charge of the property of the estate. I thought we were worried about the situation where it's a creditor. Where the United States is a creditor. That's true, but if the — And in those cases, of course, the trustee is there, right? The trustee is there, but if the debtor proposes a plan that wouldn't allow the United States to credit bid at an auction that is selling its collateral, then the United States is usually out of luck because the Anti-Deficiency Act prevents us from bidding cash. Now, I'd like to respond to one — one sort of assumption that has seemed to permeate the conversation here, which is that a secured creditor will always have an incentive to bid the full amount of its claim at an auction of its assets where the auction is supposed to be free of liens. That's actually not true. As my friend Ms. Maynard suggested, unless a bank is trying to get into the business of running a hotel or running whatever business is the collateral, the creditor will only want to take the property if it thinks it can make a profit by then turning around and selling the property. So if there's an auction where there's a cash bid and the creditor thinks that the value of the — the amount of the cash bid is actually a fair valuation of the property, the creditor has no incentive to bid higher than that in credit because it has no expectation of getting more money than that when it then takes the property and turns around and sells it. So allowing the credit bidding won't have the effect of serving as a veto on what would be a fair sale price by a cash bidder. The secured creditor's incentive is only to bid up to what it — up to what it views as the value of the property and not a penny more, because it's not trying to take the property just for the property's sake. In most cases, it wants to take the property and then sell the property. Roberts, but, of course, it could bid up if it thinks that there are going to be other bidders, right? But it has a lot more flexibility than the other bidders to the extent of its security interest. I mean, it has more flexibility because it has already put up its money, but every bidder has that incentive that you suggest, which is to try to make sure that it's — to sort of game the system a little bit and make everybody put their money where their mouth is. But Congress gave secured creditors a right to have a role where they get to put their money where their mouth is any time there's a bid. Well, that just begs the question. Congress gave them a right. I mean, that's what we're deciding, right? Absolutely. And Petitioner is certainly correct that the phrase indubitable equivalence, an unusual phrase in the statute, that that phrase is broad enough to cover any type of disposition of a secured creditor's claim, including the sale of property free of liens. But Congress also enacted two much more specific provisions right next to Clause 3. And in those provisions, number one, which governs the retention of liens on collateral, and number two, which governs the sale of collateral free of liens, there are very specific protections written into Clauses 1 and Clause 2. And this Court's interpretive canon that a specific provision will trump a more general provision where both could apply would seem clearly to apply here. If a plan proposes a disposition of a claim that is addressed by Clause 1 or Clause 2, it doesn't make any sense to allow them to strip out protections that are provided in those clauses by purporting to go under the more general standard of indubitable equivalence. That's especially true because the type of judicial valuation of the property that would take place under a Petitioner's type of scheme is not guaranteed to make sure that the creditor gets what it bargained for, which is either its money or its property. But that's exactly what Clause 2, that type of auction, is guaranteed to do. Ginsburg. What is the reference in Clause 2, we were just told, the last clause refers to under Clause 1 or Clause 3, what is the reference in 2 to Clause 3, what does that mean? Well, the type of sale contemplated in Clause 2 is essentially a liquidation of the secured creditor's lien on a property. And so the sale would essentially liquidate the lien, and then Clause 2 provides that there would need to be a replacement lien on the proceeds of the sale. That replacement lien would then have to be treated under Clause 1 or Clause 3. I think it's fair to say in most situations what happens is that the proceeds of the sale are handed over to the secured creditor, which is essentially a Clause 3 treatment of the lien on the proceeds, in the sense that if the lien on the proceeds is the lien on the pile of cash, if you hand over the pile of cash, you're surrendering the collateral that's securing that lien, which is a classic example of indubitable equivalence. That's one of the examples cited in the legislative history and in Judge Hand's opinion in Ray Murrell. I think one of the assumptions that permeates the Petitioner's brief is that valuation the value of collateral is something we can all know and agree upon, but valuation is an inherently difficult undertaking, and this Court has recognized that when Congress enacted the Code in 1978, it shifted the preference to move from judicial valuation towards market valuations. And here Congress in Clause 2 expressed its view that the type of market that would most interest in market participants, which is the secured creditor who has an interest in the property. But, of course, valuing property is what bankruptcy judges do all the time, right? They definitely do, but I think here Congress provided that this would be a situation where the secured creditor would have a role in valuing the property. And even under, as Justice Kagan pointed out, even, I think it was Justice Kagan, under Clause 1, the judge has a role in valuing the property because they have to determine the present-day value of the cash stream that the creditor would be owed. But as Judge — as my friend Ms. Maynard pointed out, maybe you'll be a judge someday. The creditor in that situation has a role in protecting itself against undervaluation because it can make the 1111B election retain the full amount of its claim if it wants and protect itself going forward. I think one way that's important is that it protects — it prevents debtors from cashing out creditors at a low value, at a point where the — in the market where the value of the property is low, because they retain the lien for the full amount. The same thing is true here. If this is a particularly low point in the market and the creditor is trying to sell the property at auction, the — I'm sorry, the debtor is trying to sell the property at auction, the creditor can come in and take the property and realize any — any upside down the road. Are there no further questions? Roberts. Thank you, counsel. Thank you. Mr. Neff, you have 4 minutes remaining. With regard to the market valuation, we are doing a market valuation, as this Court instructed in the 203 North LaSalle case from 1999, by having an auction. And after that auction, still having to prove up that we've given the indubitable equivalence by showing what occurred at that auction. And if the lenders would like to bring at that point their appraisals and show that we didn't achieve that amount, then we're not going to be able to satisfy the indubitable equivalence standard. Secondly, with regard to the role that subsection 3 plays in subsection 2. Scalia. What you just said is so long as they come in with some appraisals that are above what the property sold at for cash, then it's not the indubitable equivalence. Because you've got at least one appraiser who says it's worth more. Is that all it takes? The question — it's a very high standard. Indubitable is indubitable. It's a very high standard. And as long as you have one honest appraiser who says it's worth more. If it is a credible appraisal and we were unable to achieve that, then we will have a very difficult time satisfying that standard. But the process will have been allowed to play out, which is extremely important, because those of us who have done debtor work know how many times a lender doesn't want to do something and ultimately you have a sale or otherwise some sort of disposition of assets, the price gets high enough, and they're willing to go along with it. So with regard to the market test. Scalia, what happens if you go to the judge and the judge says there is one higher bid, so I can't say it's indubitable? Then what happens? Then you would have to provide additional consideration to the secured creditor to get it to the level that the judge would find it to be indubitable. So it's no different than at any plan confirmation hearing where you say, Judge, my plan is dependent upon the interest rate being set at 5 percent, the judge says, well, I find it should be 6 percent. You have to find a way to bridge that gap. But that assumes that you can just pull out a wad of cash from your back pocket, but mostly the debtors are not in that position, so it just seems like a gigantic waste of time. It's more so that the purchaser would have to come up with that, would have to come up with that or find some other way to bridge that gap. It's not really a waste of time because, again, you're allowing the process to play itself out. How many times we see with secured creditors are unwilling to deal with debtors because they've gotten them in a particular situation, and then when you're able to actually have an auction, they're surprised by how high the bidding gets. Because bankruptcy auctions are very fulsome events and can create quite a lot of bidding that can really generate very high value for the property. As far as the role that 3 plays in 2, it's a bit convoluted, but if you pursue a planned sale through subsection 2, you don't have to show indubitable equivalents as long as they're allowed to credit bid, but if, in fact, they don't credit bid or they are topped and you are able to raise cash, that cash must be treated in an indubitable equivalence way or in accordance with subsection 1. Sotomayor, I'm a person who believes that in the business world, the greatest security is just knowledge of what courts will do. And what the two courts who have agreed with you have done is contrary to what the majority of courts have done for the longest time. What's the value for us upsetting the norm? What's the business value for upsetting the norm? With regard to what courts have done for a very long time, for the 30 years that have been referenced, have been primarily in section — with regard to section 363 sales, as opposed to planned sales. What it means, because people didn't think they could do it in planned sales. So why should we upset the expectation? It's also difficult in a bankruptcy situation to keep a case alive long enough to get to planned confirmation, particularly if it's a business that's struggling financially, because a secured creditor has an ability to get relief from the automatic stay. So that's why we would have more section 363 sales. But with regard to the benefit, you look at a case like Philadelphia or a case like the Pacific Lumber out of the Fifth Circuit, which allowed an entire enterprise to be restructured out of a very positive sale of the timberlands that would not have had required credit bidding, because the lender simply would have taken back that one crucial asset around which the entire enterprise was restructured. So I think from a debtor's perspective, that is obviously of great concern. Sotomayor They could have gone under 1 and given the secured lender what he's entitled to, which is a future stream of payment. Roberts Please. They could have gone under 1 if, in fact, that the lender would have been precluded from making a section 1111B election and also precluded from credit bidding because credit bidding is not required under subsection 1 and an 1111B election does not apply when there is a sale. Thank you, counsel. The case is submitted.